IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs October 1, 2024

**STATE OF TENNESSEE v. ANDRE DAVIS, JR.**

**Appeal from the Circuit Court for Madison County**
**No. 22-863    Joseph T. Howell, Judge**

_____

**No. W2023-01456-CCA-R3-CD**
_____

The Madison County Grand Jury indicted Defendant, Andre Davis, Jr., for one count each of harassment and aggravated stalking. A jury found Defendant guilty as charged, and the trial court imposed an effective two-year sentence. Defendant appeals and argues that the evidence was insufficient to support his convictions. After a careful review of the record and the briefs of the parties, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Trial Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and MATTHEW J. WILSON, JJ., joined.

Raven Prean-Morris, Assistant Public Defender—Appellate Division, Franklin, Tennessee (on appeal); Jeremy Epperson, District Public Defender; and Parker O. Dixon, Assistant Public Defender, Jackson, Tennessee (at trial), for the appellant, Andre Davis, Jr.

Jonathan Skrmetti, Attorney General and Reporter; Lacy E. Wilber, Senior Assistant Attorney General; Jody Pickens, District Attorney General; and Joshua Dougan, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The victim in this case, Jasmine Doggett, testified that she and Defendant shared a six-year-old son together. Their relationship began when the victim was a student at the University of Tennessee, Knoxville, and lasted "only a few months." The victim testified that Defendant "left [her] around six months pregnant."

In 2021, the victim petitioned the Gibson County General Sessions Court for an order of protection against Defendant. The court granted the order of protection on January

10, 2022, and the order would remain in effect until January 9, 2023. The order stated that Defendant was not to "abuse or threaten to abuse [the victim] or [the victim]'s minor children" and not to "stalk or threaten to stalk [the victim] or [the victim]'s minor children." The court further ordered Defendant to have no contact with the victim, to stay away from the victim's home and workplace, and not to cause intentional damage to the victim's property. At some point, Defendant also petitioned the court for an order of protection against the victim, but it was dismissed.

In April 2022, the victim began working as a counselor at Head Start in Madison County. During her first week of work, she received "several text messages, and [she] wasn't really sure who they came from." She also received a phone call from a number she did not recognize, but she recognized Defendant's voice. She answered the call and heard "heavy breathing," followed by, "Bitch," and then the caller hung up. She took a screenshot of the call log on her phone and provided it to police. A few days later, the victim received a string of text messages from the same phone number while she was working. The messages read:

| Other number: | Jasmine??? |
|---|---|
| The victim: | Who is this? |
| Other number: | I no who dis is |
| The victim: | Huh? |
| Other number: | u no who dis is bitch |
| The victim: | Is this [Defendant]? |
| Other number: | duh bitch idk y u actin like I dont no |
| | btw I lik ur new job |
| | u no i like it wen u in brown |
| | i no u see dis u stupid ass hoe |
| | see I got da same funky ass paper u go hahaha u cant do nothin |
| | K den dont answer idk care bout no lil piece of paper |

The victim testified that the messages caused her to be "very scared," particularly the message about her wearing brown clothing and about the sender having the "same . . . paper" because she was wearing a brown outfit that day, and "the only people that were privy to [Defendant] having a[n] order of protection against [her]" were Defendant, the

- 2 -

victim and the victim's husband. The victim "wasn't too paralyzed" with fear, but she immediately asked to leave work and went to the police station that was adjacent to the school.

About the emotional impact of the messages and phone call, the victim testified that she "constantly" had to change workplaces, she was afraid to invite people into her home, she was not able to spend time with family and friends, her son had to see her in distress, and her husband used his vacation time to go with her to court dates. She testified,

> And also the biggest thing is just, our house is no longer full of peace and joy and laughter, it's a fortress, constant cameras inside and outside. Police officers, they know our names. I know just about every DA from here to Memphis because I have to deal with them so many times. It's almost like my family and friends around me are almost weary to be around me because they're never sure what could possibly happen, and it's not a good feeling.

On cross-examination, the victim explained that a police officer had told her that someone could "spoof" a call, which she assumed meant the person could use a phone number other than the phone number belonging to that person's phone. The victim believed she received the text messages on April 11, and she believed the phone call was "somewhere around that time." She testified that "everything happened around the same time span." She went to the police department on "the day it happened." The next day, she had a meeting with an officer. She testified that April 12 was the "date that's on the paper where these were printed."

The victim testified, "I know what I heard was [Defendant] on the phone, and I do believe the person that was texting me was [Defendant] because there was no one that knew about him having an order of protection against me."

The victim was the State's sole witness, and Defendant did not testify or present any other proof at trial.

### *Analysis*

On appeal, Defendant asserts that the State failed to establish beyond a reasonable doubt the elements of the offenses. He asserts that the evidence was insufficient to establish his identity as the caller or the sender of the text messages; that a threat was communicated; or that the phone call and text messages constituted a repeated or continuing course of conduct. The State argues that the evidence was sufficient to sustain Defendant's convictions for harassment and aggravated stalking.

An appellate court's standard of review when a defendant challenges the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). This Court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. *See State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. *See State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." *Id*.; *see State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The standard of proof is the same whether the evidence is direct or circumstantial. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "is the same whether the conviction is based upon direct or circumstantial evidence." *Id*. (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this Court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." *State v. Sisk*, 343 S.W.3d 60, 67 (Tenn. 2011).

A person commits the offense of harassment when he intentionally "[c]ommunicates a threat to another person, and the person communicating the threat: (A) Intends the communication to be a threat of harm to the victim; and (B) A reasonable person would perceive the communication to be a threat of harm[.]" T.C.A. § 39-17-308(a)(1)(A), (B). The crime of aggravated stalking is defined as follows:

> A person commits aggravated stalking who commits the offense of stalking as prohibited by subsection (b), and . . . [a]t the time of the offense, was prohibited from making contact with the victim under . . . an order of protection, or any other court-imposed prohibition of conduct toward the victim or the victim's property, and the person knowingly violates the injunction, order or court-imposed prohibition.

*Id*. § 39-17-315(c)(1)(E). Stalking is defined as "a willful course of conduct involving repeated or continuing harassment of another individual that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested, and that actually causes the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested[.]" *Id*. § 39-17-315(a)(4).

- 4 -

While the stalking statute mentions the word harassment, the term is defined differently in the stalking statute than in the harassment statute. The statutory term "harassment" means conduct directed toward a victim that includes, but is not limited to, repeated or continuing unconsented contact that would cause a reasonable person to suffer emotional distress, and that actually causes the victim to suffer emotional distress. Harassment does not include constitutionally protected activity or conduct that serves a legitimate purpose. *Id*. § 39-17-315(a)(3). For harassment to constitute stalking, it must be a "course of conduct directed at a specific person which would cause a reasonable person to fear an assault, bodily injury or death, including, but not limited to verbal threats, written threats, vandalism, or unconsented-to physical contact." *Id*. § 39-17-315(a)(1)(B).

The statutory term "'course of conduct' means a pattern of conduct composed of a series of two or more separate, noncontinuous acts evidencing a continuity of purpose[.]" *Id*. § 39-17-315(a)(1). Finally, the identity of the perpetrator "is an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). The perpetrator's identity "may be established solely on the basis of circumstantial evidence." *State v. Lewter*, 313 S.W.3d 745, 748 (Tenn. 2010).

Defendant argues that the proof did not establish that he was the person who called and texted the victim. The victim unequivocally identified the caller's voice as Defendant's. She had known Defendant for several years, and they had a child together. The text messages were sent from the same phone number used to call the victim. When the victim asked the text sender if it was Defendant, he responded, "duh," indicating sarcastically that Defendant was the sender. Viewed in the light most favorable to the State, the evidence was sufficient to establish Defendant's identity as the person who called and texted the victim.

Defendant takes issue with the trial court's instruction to the jury on identity.[1] The court instructed the jury as follows:

> One of the issues in this case is the identification of the defendant as the person who committed the crime. The state has the burden of proving identity beyond a reasonable doubt. Identification testimony is an expression or belief or impression by the witness, and its value may depend upon your

---

[1] There is some disagreement between the parties as to whether the record supports the trial court's issuing an instruction on identity. The record shows that the trial court gave preliminary jury instructions before opening statements. These preliminary instructions, which are unsigned by the trial judge, are contained in the technical record. The preliminary instructions include an instruction on the State's burden to prove identity beyond a reasonable doubt (T.P.I. criminal 42.05). The trial transcript reflects only that "the [c]ourt gave the preliminary charge to the jury[.]" The court's final instructions to the jury, which are both transcribed and included in the record, do not contain this identity instruction.

consideration of several factors. Some of the factors which you may consider are:

(1) The witness' capacity and opportunity to observe the offender. This includes, among other things, the length of time available for observation, the distance from which the witness is observed, the lighting, and whether the person who committed the crime was a prior acquaintance of the witness;

(2) The degree of certainty expressed by the witness regarding the identification and the circumstances under which it was made, including whether it is the product of the witness' own recollection;

(3) The occasions, if any, on which the witness failed to make an identification of the defendant, or made an identification that was inconsistent with the identification at trial; and

(4) The occasions, if any, on which the witness made an identification that was consistent with the identification at trial, and the circumstances surrounding such identifications.

*See State v. Dyle*, 899 S.W.2d 607, 612 (Tenn. 1995) (requiring trial courts to give the above instruction when identity is a material issue at trial).

Defendant does not contend that the above instruction was improper, but rather the jury was instructed to consider, among other factors, the witness' observation of the offender in determining the witness' identification of the offender. Defendant argues that the victim did not "observe" Defendant's voice for a significant length of time. The State asserts that the instruction does not apply to voice identification. A trial court's jury charge "should not contain inaccurate or inapplicable statements of legal principles that might tend to confuse the jury." *State v. Hatcher*, 310 S.W.3d 788, 812 (Tenn. 2010) (internal quotation omitted). Regardless of whether the *Dyle* instruction applies to voice identification or only to eyewitness identification, we conclude that the trial court's instruction did not confuse the issues or mislead the jury. The victim positively identified Defendant's voice as the caller, and the jury believed the circumstances of the text messages established Defendant's identity as the sender. Defendant is not entitled to relief on this issue.

Defendant further asserts that the evidence was insufficient to establish the elements of harassment because neither the phone call nor the texts communicated a threat of harm to the victim. He argues that no threat was made during the phone call, "where an individual said one word, 'Bitch,' and hung up the phone." He characterizes the text

messages as "compliments" on their face because "the individual states that the person likes the victim's new job and likes when she wears brown."

Defendant cites the Merriam-Webster definition of "threat" as "an expression of intention to inflict evil, injury, or damage." *Threat*, Merriam-Webster, https://www.merriam-webster.com/dictionary/threat (accessed October 3, 2024). The State acknowledges the dictionary definition but argues "a real-world definition" "can include a non-verbal threat."

Within the context of the facts of this case, Defendant's heavy breathing and calling the victim "Bitch" before hanging up could be construed as a threat of harm. A rational juror could conclude that Defendant intended the communication to be a threat of harm and that the victim reasonably perceived it as a threat of harm. *See* T.C.A. § 39-17-308(a)(1). Defendant's text messages conveyed that he knew where the victim worked and what she was wearing. A rational juror could conclude that Defendant communicated a threat of harm to the victim when he texted her that he knew where she worked, he had observed her that day, and that the order of protection was meaningless.

Defendant cites two cases to support his argument that the phone call and text messages did not contain an explicit threat of harm. In *State v. Teckle*, No. E2022-00686-CCA-R3-CD, 2023 WL 2726777, at *7 (Tenn. Crim. App. Mar. 31, 2023), *no perm. app. filed*, a panel of this Court reversed the trial court's pretrial dismissal of two counts of harassment, concluding that it was for the jury to determine whether the defendant's statements constituted threats to the victim. Defendant attempts to distinguish the facts of this case from those in *Teckle*, where the defendant used language such as "I will shoot her," "I will kill her," and "somebody's about to lose their life." Defendant suggests that the evidence was insufficient to establish he made threats against the victim because the phone call and text messages did not contain explicit threats "to commit violent crimes—such as murder or arson—and make no mention of shooting, killing, or bodily injury." However, as we held in *Teckle*, whether Defendant's statements constitute threats was a factual determination for the jury, and we will not reweigh the evidence.

In *State v. Wiss*, No. M2012-01547-CCA-R3-CD, 2014 WL 1259178, at *1-2 (Tenn. Crim. App. Mar. 26, 2014), *no perm. app. filed*, a panel of this Court concluded the evidence was sufficient to sustain the defendant's harassment convictions where the defendant sent the victim 50 to 100 threatening messages, including threats that he was going to kill the victim's mother. We concluded that the defendant's communications contained "threats of illegal actions including, but not limited to, murder, arson, kidnapping, conspiracy, and assault" against the victim's family. *Id*. at *4. In so concluding, however, this Court did not hold that *only* statements containing threats of murder, arson, kidnapping, conspiracy, and assault constitute threats under the harassment

statute. Again, we conclude that a rational juror could conclude that Defendant's communications with the victim constituted harassment. Defendant is not entitled to relief on this issue.

Finally, Defendant contends that the evidence was insufficient to establish all the elements of aggravated stalking because the phone call and text messages do not constitute a course of conduct of repeated or continuous harassment. Defendant argues that the State failed to show that the conduct consisted of two or more separate acts.

The proof at trial showed that the victim started a new job in April 2022. During her first week of work, Defendant called her from a phone number she did not recognize. When asked if she received additional communications from the same phone number "a few days later," the victim responded affirmatively. When asked how many days passed between the phone call and the text messages, the victim replied, "I believe it was maybe a day or two." She believed that she received the text messages on April 11 and that the phone call was "somewhere around that time." On cross-examination, the victim testified, "It happened around the same time period, within a few days." She testified that she spoke to a police officer on April 12, and that was the date that both the call log and the text messages were printed, but that the call and the texts did not occur on the same day.

This Court has upheld a conviction for aggravated stalking based on four phone calls that occurred over a period of two days. *State v. Gross*, No. M2020-01143-CCA-R3-CD, 2021 WL 3556811, at *3 (Tenn. Crim. App. Aug. 12, 2021), *no perm. app. filed*. We likewise conclude under the specific facts of this case that the evidence was sufficient to sustain Defendant's conviction for aggravated stalking. Defendant is not entitled to relief on this issue.

CONCLUSION

Based on the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
TIMOTHY L. EASTER, JUDGE